## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

### BLUEFIELD DIVISION

**SHELIA JUDE,**

      **Plaintiff,**

**v.**                                                   **Case No.: 1:21-cv-00010**

**KILOLO KIJAKAZI,**
**Acting Commissioner of the**
**Social Security Administration,**

      **Defendant.**

### PROPOSED FINDINGS AND RECOMMENDATIONS

This action seeks a review of the decision of the Commissioner of the Social Security Administration (hereinafter "Commissioner") denying Plaintiff's applications for a period of disability and disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f. The matter is assigned to the Honorable David A. Faber, United States District Judge, and was referred to the undersigned United States Magistrate Judge by standing order for submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending are Plaintiff's Brief in Support of Complaint and Motion for Judgment on the Pleadings and the Commissioner's Brief in Support of Defendant's Decision, requesting judgment in her favor. (ECF Nos. 10, 15).

The undersigned has fully considered the evidence and the arguments of counsel. For the following reasons, the undersigned **RECOMMENDS** that Plaintiff's request for

judgment on the pleadings be **DENIED**; the Commissioner's request for judgment on the pleadings be **GRANTED**; the Commissioner's decision be **AFFIRMED**; and this case be **DISMISSED** and removed from the docket of the Court.

## I.    Procedural History

In February 2019, Sheila Jude ("Claimant") protectively filed for DIB and SSI, alleging a disability onset date of February 1, 2016 due to "COPD, overactive bladder, and bi-polar." (Tr. at 218-28, 243). The Social Security Administration ("SSA") denied Claimant's applications initially and upon reconsideration. (Tr. at 12). Claimant then filed a request for an administrative hearing, which was held on June 2, 2020 before the Honorable Francine A. Serafin, Administrative Law Judge ("the ALJ"). (Tr. at 32-61). By written decision dated July 29, 2020, the ALJ found that Claimant was not disabled as defined by the Social Security Act. (Tr. at 9-30). The ALJ's decision became the final decision of the Commissioner on November 9, 2020 when the Appeals Council denied Claimant's request for review. (Tr. 1-6).

Claimant timely filed the present civil action seeking judicial review pursuant to 42 U.S.C. § 405(g). (ECF No. 1). The Commissioner subsequently filed an Answer opposing Claimant's complaint and a Transcript of the Administrative Proceedings. (ECF Nos. 8, 9). Claimant filed a Brief in Support of Complaint and Motion for Judgment on the Pleadings, and the Commissioner filed a Brief in Support of Defendant's Decision to which Claimant replied. (ECF Nos. 10, 15, 16).

## II.    Claimant's Background

Claimant was 46 years old on her alleged onset date and 51 years old on the date of the ALJ's decision. (Tr. at 24). She communicates in English, has the equivalent of a high school education, and previously worked as a waitress, cook, and scale-house operator.

(Tr. at 53-54, 242, 244).

III.    **Summary of ALJ's Decision**

Under 42 U.S.C. § 423(d)(5), a claimant seeking disability benefits has the burden of proving a disability. *See Blalock v. Richardson,* 483 F.2d 773, 775 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

The Social Security regulations establish a five-step sequential evaluation process for the adjudication of disability claims. If an individual is found "not disabled" at any step of the process, further inquiry is unnecessary, and benefits are denied. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The first step in the sequence is determining whether a claimant is currently engaged in substantial gainful employment. *Id.* §§ 404.1520(b), 416.920(b). If the claimant is not, then the second step requires a determination of whether the claimant suffers from a severe impairment. *Id.* §§ 404.1520(c), 416.920(c). A severe impairment is one that "significantly limits [a claimant's] physical or mental ability to do basic work activities." *Id*. If severe impairment is present, the third inquiry is whether this impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4 (the "Listing"). *Id.* §§ 404.1520(d), 416.920(d). If so, then the claimant is found disabled and awarded benefits.

However, if the impairment does not meet or equal a listed impairment, the adjudicator must assess the claimant's residual functional capacity ("RFC"), which is the measure of the claimant's ability to engage in substantial gainful activity despite the limitations of his or her impairments. *Id.* §§ 404.1520(e), 416.920(e). After making this determination, the fourth step is to ascertain whether the claimant's impairments prevent

3

the performance of past relevant work. *Id.* §§ 404.1520(f), 416.920(f). If the impairments do prevent the performance of past relevant work, then the claimant has established a *prima facie* case of disability, and the burden shifts to the Commissioner to demonstrate, in the fifth and final step of the process, that the claimant is able to perform other forms of substantial gainful activity, given the claimant's remaining physical and mental capacities, age, education, and prior work experiences. 20 C.F.R. §§ 404.1520(g), 416.920(g); *see also McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983). The Commissioner must establish two things: (1) that the claimant, considering his or her age, education, skills, work experience, and physical shortcomings has the capacity to perform an alternative job, and (2) that this specific job exists in significant numbers in the national economy. *McLamore v. Weinberger*, 538 F.2d. 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the SSA "must follow a special technique at each level in the administrative review process," including the review performed by the ALJ. 20 C.F.R. §§ 404.1520a(a), 416.920a(a). Under this technique, the ALJ first evaluates the claimant's pertinent signs, symptoms, and laboratory results to determine whether the claimant has a medically determinable mental impairment. *Id.* §§ 404.1520a(b), 416.920a(b). If an impairment exists, the ALJ documents his findings. Second, the ALJ rates and documents the degree of functional limitation resulting from the impairment according to criteria specified in 20 C.F.R. §§ 404.1520a(c), 416.920a(c). Third, after rating the degree of functional limitation from the claimant's impairment(s), the ALJ determines the severity of the limitation. *Id.* §§ 404.1520a(d), 416.920a(d). A rating of "none" or "mild" in the four functional areas of understanding, remembering, or applying information; (2) interacting with others; (3) maintaining concentration, persistence, or pace; and (4) adapting or managing oneself will result in a finding that the

4

impairment is not severe unless the evidence indicates that there is more than minimal limitation in the claimant's ability to do basic work activities. *Id.* §§ 404.1520a(d)(1), 416.920a(d)(1). Fourth, if the claimant's impairment is deemed severe, the ALJ compares the medical findings about the severe impairment and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment meets or is equal to a listed mental disorder. *Id.* §§ 404.1520a(d)(2), 416.920a(d)(2). Finally, if the ALJ finds that the claimant has a severe mental impairment, which neither meets nor equals a listed mental disorder, the ALJ assesses the claimant's residual mental functional capacity. *Id.* §§ 404.1520a(d)(3), 416.920a(d)(3). The regulations further specify how the findings and conclusion reached in applying the technique must be documented by the ALJ, stating:

> The decision must show the significant history, including examination and laboratory findings, the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each of the functional areas described in paragraph (c) of this section.

20 C.F.R. §§ 404.1520a(e)(4), 416.920a(e)(4).

Here, the ALJ determined as a preliminary matter that Claimant met the insured status for disability insurance benefits through December 31, 2018. (Tr. at 14, Finding No. 1). At the first step of the sequential evaluation, the ALJ confirmed that Claimant had not engaged in substantial gainful activity since February 1, 2016, the alleged disability onset date. (*Id.*, Finding No. 2). At the second step of the evaluation, the ALJ found that Claimant had the following severe impairments: bladder disorder [status post] surgical prolapse repair; ventral hernia status post surgical repair; chronic obstructive pulmonary disease (COPD); anxiety; bipolar disorder; adjustment disorder; and status post right wrist fracture surgically repaired. (Tr. at 15, Finding No. 3).

5

Under the third inquiry, the ALJ concluded that Claimant did not have an impairment or combination of impairments that met or medically equaled any of the impairments contained in the Listing. (Tr. at 15-17, Finding No. 4). Accordingly, the ALJ determined that Claimant possessed:

> [T]he residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except the claimant can occasionally climb ramps, stairs, ladders, ropes, or scaffolds; can frequently balance; can occasionally stoop, kneel, crouch, and crawl; must avoid frequent exposure to extreme cold, heat, wetness, humidity, fumes, odors, dusts, gases and other poor ventilation, and workplace hazards such as moving machinery or unprotected heights; and is capable of simple, routine, repetitive tasks that involve no more than 3-step work activities or tasks and only occasional brief interactions with coworkers, supervisors and the public.

(Tr. at 17-23, Finding No. 5).

At the fourth step, the ALJ determined that Claimant could not perform her past relevant work. (Tr. at 23-24, Finding No. 6). Therefore, the ALJ reviewed Claimant's prior work experience, age, and education in combination with her RFC to determine her ability to engage in other substantial gainful activity. (Tr. at 24-25, Findings 7 through 10). The ALJ considered that (1) Claimant was born in 1969 and was defined as a younger individual age 18-49 on her alleged disability onset date, but she subsequently changed age category to an individual closely approaching advanced age; (2) Claimant had at least a high school education; and (3) transferability of job skills was not an issue because the Medical-Vocational Rules supported a finding that Claimant was "not disabled," regardless of her transferable job skills. (Tr. at 24, Findings 7 through 9). Taking into account these factors, Claimant's RFC, and the testimony of a vocational expert ("VE"), the ALJ determined that Claimant could perform other jobs that existed in significant numbers in the national economy, including work as a silver wrapper, housekeeping/cleaner, and office helper. (Tr. at 24-25, Finding No. 10). Consequently,

the ALJ concluded that Claimant was not disabled as defined by the Social Security Act and was not entitled to benefits. (Tr. at 25, Finding No. 11).

## IV. <u>Claimant's Challenges to the Commissioner's Decision</u>

Claimant asserts two challenges to the Commissioner's decision. First, she argues that the ALJ failed to ask the VE whether his testimony conflicted with the information contained in the Dictionary of Occupational Titles (DOT) as required by relevant law. (ECF No. 10 at 4-7). Second, Claimant contends that the ALJ did not logically explain her RFC finding that Claimant can change her urinary incontinence pads and perform personal hygiene outside of work hours and during normal work breaks. (*Id.* at 9). Claimant further asserts that the ALJ erroneously expressed her RFC first and then concluded that her limitations were consistent with it. (*Id.*).

In response to Claimant's challenges, the Commissioner argues that it was harmless error for the ALJ not to question the VE whether his testimony was consistent with the DOT because there was no apparent conflict for the ALJ to resolve. (ECF No. 15 at 6-9). Regarding the RFC assessment, the Commissioner notes that light-level work provides for standard breaks every two hours, and Claimant does not identify any evidence to support her claim that incontinence impacts her ability to complete a workday. (*Id.* at 10). The Commissioner maintains that the ALJ thoroughly analyzed the evidence concerning Claimant's incontinence and explained the reasoning for the RFC assessment. (*Id.* at 10-11). In reply to the Commissioner's response, Claimant states that it is unknown if there were any conflicts between the VE's testimony and the DOT because the ALJ did not ask the VE that question. (ECF No. 16).

## V. <u>Relevant Evidence</u>

The undersigned has reviewed all of the evidence before the Court. The

information that is most pertinent to Claimant's challenges is summarized as follows:

### A. Treatment Records

On August 8, 2017, Claimant presented as a new patient to internist Mahesh B. Patel, M.D. Claimant complained of left flank and abdominal pain, burning during urination, and frequent urination for two to three days. (Tr. at 359). Dr. Patel diagnosed Claimant with a urinary tract infection and prescribed an antibiotic. (Tr. at 360). Claimant followed up with Dr. Patel on September 5, 2017 regarding urinary incontinence, from which she reportedly suffered since her hysterectomy in January 1995. (Tr. at 354); *see* (Tr. at 324). Claimant stated that she wore a urinary incontinence pad at all times. (*Id.*). Dr. Patel referred Claimant to a gynecologist, James Daucher, M.D. (*Id.*).

Dr. Daucher examined Claimant on September 12, 2017 and diagnosed her with urinary incontinence, increased frequency of urination, urgent desire to urinate, mixed urinary incontinence, and prolapse of vaginal vault after hysterectomy. (Tr. at 326). Cystometry and cystoscopy tests performed that day showed stress urinary incontinence and a two millimeter lesion at Claimant's right bladder base, but the results were otherwise normal. (Tr. at 325). Dr. Daucher recommended surgery to repair Claimant's prolapse and treat her stress incontinence. (Tr. at 326). He performed urodynamic testing on September 19, 2017, which confirmed his diagnoses and plan. (Tr. at 328-29).

Claimant underwent abdominosacral colpopexy, posterior colporrhaphy, and placement of a midurethral sling with cystoscopy on October 9, 2017. (Tr. at 579). During follow up with her surgeon, Frederick W. Barker, M.D., on August 8, 2019, Claimant complained of a "charlie's horse" in her abdomen, and Dr. Barker discovered a ventral hernia at Claimant's lower abdominal scar. (Tr. at 420). On August 16, 2019, there were no acute findings in Claimant's abdominal and pelvic CT scan, including no abnormalities

in Claimant's kidneys, ureters, or bladder. (Tr. at 622). However, Claimant continued to express urinary complaints to Dr. Daucher on September 5, 2018. She reported urinary urgency, frequency, and occasional leakage following a strong urge to void. (Tr. at 340). According to Claimant, she had very little warning before needing to urinate and if she was unable to reach the bathroom she would almost urinate or occasionally urinate on herself. (*Id.*). Claimant also complained of urine leakage when laughing, coughing, or sneezing, and she stated that it was significant enough that she had to wear a pad and it significantly diminished her quality of life. (*Id.*). Dr. Daucher performed another cystometry test and diagnosed Claimant with mixed urinary incontinence, including stress incontinence and refractory overactive bladder. (Tr. at 340-41). He recommended dietary and behavioral therapy and prescribed a two-week sample of Toviaz for overactive bladder. (*Id.*).

Dr. Barker surgically repaired Claimant's ventral hernia on October 7, 2019. (Tr. at 389). During post-surgical follow up on October 15, 2019, Claimant reported difficulty urinating and incontinence. (Tr. at 409). Dr. Barker referred Claimant to a urologist. (Tr. at 412). On December 4, 2019, Claimant presented as a new patient to Shannon L. Hilling, CFNP, regarding urinary issues. (Tr. at 558). Claimant reported abdominal pain and mixed stress and urge incontinence, but primarily stress incontinence. (*Id.*). Claimant stated that she used seven large pads per day, although she was not on any medications related to incontinence. (Tr. at 558, 559). On examination, Claimant's abdomen was distended but soft, and her surgical scar was healed. (Tr. at 562). Nurse Hilling recorded that Claimant's urine analysis was "essentially negative," and her post-void residual urine test was 166 mL. (Tr. at 558).

## B. *Evaluations and Prior Administrative Findings*

Carol Dennison, NP, performed a consultative examination of Claimant on May 9, 2019. Claimant alleged that she suffered from overactive bladder and was unable to go anywhere or she would urinate on herself. (Tr. at 365). Nonetheless, Claimant did not appear to be in any acute distress; looked healthy; ambulated normally; and could get on and off of the examination table, squat, perform tandem heel and toe walking, and perform range of motion exercises, all without any difficulty. (Tr. at 365).

On May 21, 2019, state agency physician Narendra Parikshak, M.D., assessed Claimant's RFC based upon a review of Claimant's records. She concluded that Claimant could perform work at the medium exertional level with occasional climbing; unlimited balancing; and frequent stooping, kneeling, crouching, and crawling. (Tr. at 70-71, 84). Dr. Parikshak further determined that Claimant should avoid concentrated exposure to extreme cold, wetness, humidity, and hazards and even moderate exposure to fumes, odors, dusts, gases, and poor ventilation. (Tr. at 71, 85).

Psychologist Katherine Marshall, M.S., performed a consultative mental examination of Claimant on June 17, 2019. During the evaluation, Claimant stated that she lived alone and cleaned her aunt's house to help pay for utilities. (Tr. at 381, 382). Upon review of Claimant's records, state agency psychologist James Capage, Ph.D., assessed on July 3, 2019 that Claimant could understand, remember, and carry out three step work activities and make simple work-related decisions. (Tr. at 73, 87). Dr. Capage further concluded that Claimant could deal with usual changes in the work setting and maintain concentration with customary work breaks. (*Id*.). He noted that Claimant was best suited to a work setting that required no more than occasional and brief interactions with supervisors, coworkers, and the public. (*Id*.).

On November 18, 2019, state agency physician Uma Reddy, M.D., assessed the same RFC findings as Dr. Parikshak, except Dr. Reddy found that Claimant could frequently balance and should have no concentrated exposure to extreme heat. (Tr. at 102-04). John Todd, Ph.D., affirmed Dr. Capage's mental RFC findings on November 23, 2019. (Tr. at 105).

### C. Claimant's Statements

Claimant completed a function report on April 10, 2019. She noted that she lived alone in a house and alleged that she had to change her pads and clothes during the day due to incontinence. (Tr. at 251-53). Claimant documented that she went outside daily and drove, but she stated that she had to impose a time limit when shopping unless there was a bathroom. (Tr. at 254). Claimant reportedly attended medical appointments two to three times per week. (Tr. at 255).

During the administrative hearing on June 2, 2020, Claimant testified that she was in the bathroom eight to ten times per day, which roughly equated to one bathroom break per hour. (Tr. at 39). Claimant stated that she cleaned herself with soap and a rag or baby wipes to prevent urinary tract infections and reduce odor, and she successfully avoided any urinary tract infections. (Tr. at 39, 42). Claimant testified that she was incontinent when she worked as a scale-house operator, and her employer brought in a porta potty for her to use, but Claimant stated that she did not require as many breaks at that time. (Tr. at 38). Claimant reportedly suffered urinary incontinence accidents at least once per week, and she had limited ability to stand, squat, and lift because the activities exacerbated her incontinence. (Tr. at 40, 41). Claimant wore Depends at nighttime and large pads during the day, which she changed every hour. (Tr. at 42). She claimed to have trouble concentrating because she was constantly thinking about avoiding an accident.

(Tr. at 46). Claimant was able to care for her personal needs; do laundry every two weeks; prepare meals; and sweep, mop, and vacuum weekly. (Tr. at 47-48). Claimant stated that she no longer cooked meals and typically only ate microwaveable food because the more that she stood, the more that urine leaked. (Tr. at 48). Claimant previously shopped at the Dollar Store, but she stated that she had not been anywhere in two months because bathrooms were closed due to the pandemic. (Tr. at 49).

### D. VE's Testimony

During Claimant's administrative hearing, the ALJ asked the VE if someone with Claimant's characteristics and RFC could perform any jobs, and the VE responded that the hypothetical person could work as a silver wrapper, DOT 318.687-018; housekeeping cleaner, DOT 323.687-014; or office helper, DOT 239.567-010. (Tr. at 55-57). In response to Claimant's counsel's questioning, the VE further testified that employers allowed employees to be off task 15 percent of the workday, which could accommodate five-to-ten minute restroom breaks every hour. (Tr. at 58). However, the VE cautioned that there would not be any jobs available to a person that could not wait for suitable times to take breaks and instead needed to immediately leave the workstation twice per day to go to the restroom, regardless of whether the person was needed by supervisors or coworkers at that moment. (Tr. at 59). The VE also stated that frequent urinary incontinence accidents that were evident to others would preclude employment. (Tr. at 60).

## VI.   <u>Standard of Review</u>

The issue before the Court is whether the final decision of the Commissioner is based upon an appropriate application of the law and is supported by substantial evidence. *See Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). In *Blalock v. Richardson*, the Fourth Circuit Court of Appeals defined "substantial evidence" to be:

> [E]vidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Blalock*, 483 F.2d at 776 (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)). This Court is not charged with conducting a *de novo* review of the evidence. Instead, the Court's function is to scrutinize the record and determine whether it is adequate to support the conclusion of the Commissioner. *Hays*, 907 F.2d at 1456. When conducting this review, the Court does not re-weigh evidence, make credibility determinations, or substitute its judgment for that of the Commissioner. *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 2001) (citing *Hays*, 907 F.2d at 1456)). Moreover, "[t]he fact that the record as a whole might support an inconsistent conclusion is immaterial, for the language of § 205(g) ... requires that the court uphold the [Commissioner's] decision even should the court disagree with such decision as long as it is supported by 'substantial evidence.'" *Blalock*, 483 F.2d at 775 (citations omitted). Thus, the relevant question for the Court is "not whether the claimant is disabled, but whether the ALJ's finding of no disability is supported by substantial evidence." *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (citing *Craig*, 76 F.3d at 589).

## VII.  <u>Discussion</u>

Claimant challenges the ALJ's RFC analysis and reliance on the VE's testimony to conclude that Claimant could perform other work at step five of the sequential evaluation. Each argument is considered below, in turn.

### A.  *RFC*

Claimant contends that the ALJ did not articulate any logical explanation for the RFC assessment that Claimant could change her urinary incontinence pads and address

hygiene concerns outside of work hours and during normal work breaks. (ECF No. 10 at 9). SSR 96-8p provides guidance on how to properly assess a claimant's RFC, which is the claimant's "ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis." SSR 96-8p, 1996 WL 374184, at *1. RFC is a measurement of the ***most*** that a claimant can do despite his or her limitations resulting from both severe and non-severe impairments, and the finding is used at steps four and five of the sequential evaluation to determine whether a claimant can still do past relevant work and, if not, whether there is other work that the claimant is capable of performing. *Id.* According to the Ruling, the ALJ's RFC determination requires "a function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities." *Id.* at *3.

The functions which the ALJ must assess include a claimant's physical abilities, such as sitting, standing, walking, lifting, carrying, pushing, pulling, or other physical functions (including manipulative or postural functions, such as reaching, handling, stooping, or crouching); mental abilities, such as understanding, remembering, and carrying out instructions and responding appropriately to supervision, coworkers, and work pressures in a work setting; and other abilities, such as seeing and hearing. 20 CFR §§ 404.1545(b)-(d), 416.945(b)-(d).

Only by examining specific functional abilities can the ALJ determine (1) whether a claimant can perform past relevant work as it was actually, or is generally, performed; (2) what exertional level is appropriate for the claimant; and (3) whether the claimant "is capable of doing the full range of work contemplated by the exertional level." SSR 96-8p, 1996 WL 374184, at *3. Indeed, "[w]ithout a careful consideration of an individual's functional capacities to support an RFC assessment based on an exertional category, the

adjudicator may either overlook limitations or restrictions that would narrow the ranges and types of work an individual may be able to do, or find that the individual has limitations or restrictions that he or she does not actually have." *Id.* at *4. In determining a claimant's RFC, the ALJ "must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g. laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." *Id.* at *7. Further, the ALJ must "explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved." *Id.* at *7.

While an ALJ is not required to explicitly discuss "irrelevant or uncontested" functions, "[r]emand may be appropriate where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review." *Mascio v. Colvin*, 780 F.3d 632, 636 (4th Cir. 2015) (quoting *Cichocki v. Astrue*, 729 F.3d 172, 177 (2d Cir. 2013)) (markings omitted).

In this case, the ALJ considered Claimant's allegations that her overactive bladder constantly dripped and caused wetness; certain activities caused urine leakage, which increased Claimant's anxiety; she was in the bathroom eight to ten times per day, amounting to approximately once per hour when awake; had no bladder control at all and had to get to the restroom or had an accident; suffered depression and humiliation from urinary accidents; had to clean herself to avoid urinary tract infections; had a urinary accident at least once per week; had constant urinary dripping while standing, which required more time in the bathroom to change her clothes; wore pads during the day and Depends at night; was supposed to go to Wake Forest to have a TENS unit placed on her bladder, but could not go because of insurance; and had to carry a bag of clean clothes

15

everywhere in case of an accident. (Tr. at 17-18). The ALJ also considered Claimant's medical records, which documented overactive bladder and mixed urinary incontinence, a prescription for Toviaz, and surgery for vaginal prolapse and stress incontinence. (Tr. at 19). However, the ALJ considered that records in December 2019 did not reflect that Claimant was prescribed any medication to treat overactive bladder or incontinence, nor did Claimant's urologist refer Claimant for further treatment. (*Id*.). The ALJ noted that Claimant's 2019 CT scan was normal, and the record did not indicate that she was continued on Toviaz, prescribed any other medications to treat her urinary issues, or that a stimulator implant was recommended. (Tr. at 20). Furthermore, the ALJ considered that Claimant's providers did not observe any urine leakage or hygiene deficits on examination, and the number of pads that Claimant reported using during the day was not consistent with her allegation that she needed to change her pad every 20 minutes. (*Id*.).

The ALJ also evaluated Claimant's activities of daily living and the opinions offered in the matter. The ALJ noted that despite Claimant's alleged symptoms she lived alone, cared for her personal needs, performed household chores, drove, and cleaned her aunt's house to pay for utilities. (Tr. at 22). Further, the ALJ noted that although Claimant testified that she had daily accidents she reported only doing laundry every two weeks. (*Id*.). The ALJ considered the state agency physicians' prior administrative medical findings in which they concluded that Claimant could perform work at the medium exertional level, but the ALJ did not find the assessments persuasive in light of the objective evidence of Claimant's stress urinary incontinence and history of surgery for vaginal prolapse and ventral hernia. (Tr. at 23). The ALJ found that the postural and environmental limitations that the state agency physicians assessed were consistent with

Claimant's complaints of some abdominal tenderness, normal abdominal CT scan, and absence of respiratory and musculoskeletal deficits on examination or medications to treat incontinence. (*Id.*). Overall, after considering the evidence, the ALJ found that Claimant could perform a range of light work. (Tr. at 17, 23). The ALJ concluded that Claimant could change her pads and address hygiene concerns outside of work hours and during normal breaks and meals during the workday. (Tr. at 20). Therefore, the ALJ did not assess any additional RFC limitations related to Claimant's incontinence. (*Id.*).

Although Claimant disagrees with the ALJ's above RFC assessment, she does not identify evidence that the ALJ overlooked or errors in the analysis that warrant remand of the decision. The ALJ considered the relevant evidence and articulated reasons based on the record that Claimant did not require additional work breaks, off task time, or other RFC limitations due to incontinence. Namely, the ALJ cited Claimant's testimony that she needed to go to the restroom approximately every hour during the day. (Tr. at 18). The VE testified that limitation could be accommodated during normal work breaks. (Tr. at 39, 58). Contrary to Claimant's allegations that she had to rush to the restroom immediately when feeling the urge to urinate and she had at least one accident per week, the ALJ noted that Claimant only did laundry every two weeks and her providers did not note any leakage on examinations or hygiene deficits during her frequent medical appointments. (Tr. at 18, 20, 22). Furthermore, as the ALJ considered that although Claimant had surgery for vaginal prolapse and a hernia and was prescribed a trial of Toviaz her subsequent records did not suggest further surgery or note any medications to treat overactive bladder or incontinence. Finally, the ALJ considered Claimant's daily activities, including doing housework, living alone, driving, and caring for her needs independently, as well as the opinion evidence that did not include any additional

limitations related to incontinence. (Tr. at 22-23, 47-48, 70-71, 84-85, 102-04).

To the extent that the ALJ did not better articulate the RFC assessment that Claimant's incontinence needs could be accommodated during normal breaks in the workday and outside of work hours, the error was harmless because the ALJ provided a sufficient explanation to allow for meaningful review, and her reasoning was supported by substantial evidence. The Court is not in the position to independently review the record and make findings of fact, evaluate Claimant's subjective symptoms, or perform any other functions reserved to the Commissioner. Here, there is more than a scintilla of evidence to support the ALJ's RFC assessment, and the ALJ correctly applied the law.

For those reasons, the Court must uphold the RFC determination. *See, e.g., Cyrus v. Saul*, No. 3:19-CV-00258, 2020 WL 1921571, at *13–14 (S.D.W. Va. Apr. 3, 2020), *report and recommendation adopted,* 2020 WL 1917337 (S.D.W. Va. Apr. 20, 2020) (finding that the ALJ's assessment that the claimant's incontinence did not warrant additional RFC restrictions, including time off task, was supported by substantial evidence); *Moats v. Saul*, No. 1:20-CV-53, 2021 WL 708617, at *8 n.7 (N.D.W. Va. Feb. 4, 2021), *report and recommendation adopted,* 2021 WL 708605 (N.D.W. Va. Feb. 23, 2021) ("The record does not suggest that Plaintiff's urinary leakage and changing of her diapers would impact her employment and RFC"); *Stephens v. Saul*, No. 3:20-CV-00046, 2020 WL 5665813, at *21 (S.D.W. Va. Sept. 4, 2020), *report and recommendation adopted,* 2020 WL 5665070 (S.D.W. Va. Sept. 23, 2020) (finding that substantial evidence supported the ALJ's analysis that claimant's urinary incontinence did not imposed additional RFC limitations, such as time off task or work absences); *Crabtree v. Berryhill*, No. 1:17CV557, 2018 WL 1801955, at *6 (M.D.N.C. Apr. 13, 2018) ("Moreover, contrary to Plaintiff's argument, the ALJ sufficiently explained the basis for the RFC

determination. First, the ALJ evaluated Plaintiff's subjective complaints, including her reports that she needed to use the restroom five to seven times before she left the house in the morning and two to three times per hour after that, needed to quickly find a restroom after a meal, experienced discomfort from cramping, and suffered incontinence with sneezing, lifting/carrying, or a dog pulling on a leash. However, the ALJ ultimately found that her 'statements concerning the intensity, persistence and limiting effects of [her] symptoms [we]re not entirely consistent with the medical evidence and other evidence in the record.' The ALJ supported his analysis of Plaintiff's subjective complaints with substantial evidence, including a discussion of Plaintiff's daily activities, such as cooking, cleaning, light gardening, caring for her dog, using her computer, reading, grocery shopping, volunteering at the animal shelter, and taking successful trips to the mountains, the beach, and New Orleans.") (citations omitted).

The decision in this matter is distinguishable from cases which have been remanded for lack of logical explanation. For instance, the Fourth Circuit recently reversed and remanded a case in which an ALJ did not address the issue of frequent urination in the RFC or elsewhere in her opinion. *Benfield v. Saul*, 827 F. App'x 297, 301 (4th Cir. 2020). The Fourth Circuit noted that the claimant testified that he urinated 20 to 30 times each day, and the VE testified that all work would be precluded if an individual needed to go to the bathroom an average of 10 times per workday outside of scheduled breaks, yet the ALJ did not articulate any consideration of that evidence. Although the district court attempted to explain that, considering nonwork hours and scheduled breaks, the ALJ could reasonably have concluded that the claimant would have needed fewer than 10 unscheduled bathroom breaks in a workday, the Fourth Circuit stated that "it is not the court's responsibility to guess at the ALJ's reasoning." *Id*. The Court

explained that while the district court's reasoning "may be true [...] without an explanation from the ALJ, [the Court] cannot perform a meaningful review." *Id.*

District courts within the Fourth Circuit have similarly remanded cases for lack of logical explanation. *See, e.g., Gross v. Saul*, No. 5:18-CV-00058-MR, 2019 WL 4440043, at *5 (W.D.N.C. Sept. 16, 2019) (finding that the ALJ did not articulate any explanation why the claimant's incontinence did not impose RFC limitations); *Robinson v. Saul*, No. CV22001659MBSMGB, 2021 WL 3410544, at *5 (D.S.C. June 11, 2021), *report and recommendation adopted,* 2021 WL 2947732 (D.S.C. July 14, 2021) (finding that because the ALJ did not state that the claimant's incontinence needs could be accommodated during regular work breaks or that the testimony was inconsistent with other evidence, the court could not meaningfully review of the decision); *McNeely v. Saul*, No. 2:20-CV-00158, 2020 WL 5648214, at *10 (S.D.W. Va. Sept. 4, 2020), *report and recommendation adopted,* 2020 WL 5649483 (S.D.W. Va. Sept. 22, 2020) (finding that the ALJ did not provide any meaningful explanation for a specific off-task limitation related, in part, to frequent bathroom breaks); *Ellis v. Colvin*, No. 815CV05034RMGJDA, 2017 WL 436101, at *11 (D.S.C. Jan. 24, 2017), *report and recommendation adopted sub nom. Ellis v. Berryhill,* 2017 WL 432696 (D.S.C. Jan. 31, 2017) (finding that the ALJ erred in not identifying any evidence that was inconsistent with the record showing that the claimant needed to go to the restroom two to four times per hour for five minutes at one time, which was  important because the VE testified that there would be no work for a person who would have to leave the job two times per hour, or ten minutes per hour, to urinate.).

Unlike the above cases, it is evident here that the ALJ considered the relevant evidence concerning Claimant's urinary incontinence and explained why further RFC restrictions were not warranted. The ALJ made a specific finding that Claimant's

incontinence could be accommodated during normal breaks and identified specific reasons for that finding, including Claimant's presentation at medical appointments, daily activities, treatment history, and testimony. That evidence, combined with the VE's testimony and prior administrative findings, provided clear support for the ALJ's RFC assessment. The ALJ provided sufficient explanation that was grounded in the evidence to support the RFC determination and her rationale was apparent. For those reasons, the undersigned **FINDS** that the ALJ's RFC assessment is supported by substantial evidence.

### B. VE's Testimony

Claimant next argues that the ALJ erred by not asking the VE if his testimony conflicted with the DOT regarding a person being off-task, taking bathroom breaks, and having urinary incontinence accidents. (ECF No. 10 at 4-7). Claimant does not identify any actual or apparent conflicts between the VE's testimony and the DOT, but asserts that it is unknown if there were any conflicts because the ALJ did not ask the VE if his testimony was consistent with the DOT as required by law. (ECF Nos. 10, 16).

To determine at step five of the sequential evaluation whether sufficient other work exists for the claimant in the national economy, the ALJ primarily relies on the DOT. *Pearson v. Colvin*, 810 F.3d 204, 207 (4th Cir. 2015) (citing SSR 00–4p, 2000 WL 1898704, at *2). "The ALJ may also use a vocational expert to address complex aspects of the employment determination, including the expert's observations of what a particular job requires in practice or the availability of given positions in the national economy." *Id.* In order for a VE's opinion to be relevant, it must be in response to a proper hypothetical question that sets forth all of the claimant's impairments. *English v. Shalala*, 10 F.3d 1080, 1085 (4th Cir. 1993); *Walker v. Bowen*, 889 F.2d 47, 50-51 (4th Cir. 1989). To frame a proper hypothetical question, the ALJ must first translate the claimant's physical and

mental impairments into an RFC that is supported by the evidence; one which adequately reflects the limitations imposed by the claimant's impairments. *Lacroix v. Barnhart*, 465 F.3d 881, 889 (8th Cir. 2006). "[I]t is the claimant's functional capacity, not his clinical impairments, that the ALJ must relate to the vocational expert." *Fisher v. Barnhart,* 181 F. App'x 359, 364 (4th Cir. 2006). A hypothetical question will be "unimpeachable if it adequately reflects a residual functional capacity for which the ALJ had sufficient evidence." *Id.* (citing *Johnson v. Barnhart,* 434 F.3d 650, 659 (4th Cir. 2005)) (internal quotation marks omitted); *see also Russell v. Barnhart*, 58 F. App'x 25, 30 (4th Cir. 2003) (noting that hypothetical question "need only reflect those impairments supported by the record"). However, "[t]he Commissioner can show that the claimant is not disabled only if the vocational expert's testimony that jobs exist in the national economy is in response to questions from the ALJ that accurately reflect the claimant's work-related abilities." *Morgan v. Barnhart*, 142 F. App'x 716, 720-21 (4th Cir. 2005).

SSR 00-4p requires an ALJ to "inquire, on the record" whether a VE's testimony conflicts with the DOT. SSR 00-4p, 2000 WL 1898704, at *2. "When there is an apparent unresolved conflict between VE ... evidence and the DOT, the adjudicator must elicit a reasonable explanation for the conflict." *Id.* Ultimately, SSR 00-4p requires an ALJ to "resolve" any such conflict "before relying on the VE ... evidence to support a determination or decision about whether the claimant is disabled." *Id.*

In this case, the ALJ asked the VE during Claimant's administrative hearing if someone with Claimant's characteristics and RFC could perform any jobs, and the ALJ answered that the hypothetical person could work as a silver wrapper, DOT 318.687-018; housekeeping cleaner, DOT 323.687-014; or office helper, DOT 239.567-010. (Tr. at 55-57). The VE further stated that employers tolerated 15 percent off task behavior in certain

jobs, but 20 percent or more time off task precluded employment. (Tr. at 57). In response to Claimant's counsel's questioning, the VE explained that the allowable 15 percent off task time could accommodate a restroom break every hour for five to ten minutes. (Tr. at 58). However, the person could not work if she could not wait for suitable times to take breaks and instead needed to immediately leave the workstation twice per day to go to the restroom, regardless of whether the person was needed for a task at that moment. (Tr. at 59). The VE likewise stated that having frequent urinary incontinence accidents that are evident to others would preclude employment. (Tr. at 60).

Claimant is correct that the ALJ did not ask the VE whether his testimony was consistent with the DOT. (Tr. at 52-61). However, the error was harmless in this case because there was no apparent conflict between the VE's testimony and the DOT's description of at least one job that the ALJ relied upon at step five of the sequential evaluation. *See, e.g., Richardson v. Berryhill*, No. 517CV00173RJCDSC, 2019 WL 1354042, at *4 (W.D.N.C. Mar. 26, 2019) (discussing that an ALJ is only required to find that a claimant can perform at least one job that exists in significant numbers in the national economy in order to find her non-disabled).

The hypothetical that the ALJ posed to the VE was restricted to light exertional work; occasional climbing, stooping, kneeling, crouching, and crawling; frequent balancing and exposure to extreme cold or heat, wetness, humidity, fumes, odors, dusts, gases, other poor ventilation, and hazards; simple, routine, repetitive work involving no more than three-step work activities or tasks; and occasional and brief interactions with supervisors, co-workers, and the public. (Tr. at 55-56). The VE responded that the hypothetical individual could work as a cleaner/housekeeper, DOT 323.687. (Tr. at 56). According to the DOT, that job requires light exertional strength; reasoning level 1,

defined as understanding and carrying out simple one or two-step instructions; no significant taking of instructions or helping people; occasional stooping, kneeling, crouching; and no climbing, balancing, crawling, talking, or exposure to extreme cold, heat, wetness and/or humidity, electrical shock, moving mechanical parts, high exposed places, radiation, explosives, toxic caustic chemicals, or other environmental conditions. DOT 323.687-014, Cleaner, Housekeeping, 1991 WL 672783. Claimant does not identify, nor does there appear to be, any conflict between the evidence produced by the VE and the foregoing DOT description.

"While ALJs have the affirmative duty to ask the VE if the evidence [the VE] produced conflicts with the DOT, a violation of that duty does not always warrant remand. An ALJ commits harmless error when she fails to inquire as to conflicts between the VE testimony and the DOT when no conflict existed in the first place. It is therefore left to the Court to determine if an apparent conflict actually exists between the jobs recommended by the VE and the DOT." *Edwards v. Berryhill*, No. 5:16-CV-00197-RJC, 2018 WL 1176067, at *5 (W.D.N.C. Mar. 6, 2018); *see also Anika M. V. v. Saul*, No. 2:19CV652, 2021 WL 684519, at *18–19 (E.D. Va. Jan. 7, 2021), *report and recommendation adopted,* 2021 WL 683162 (E.D. Va. Feb. 22, 2021) (finding harmless error where there was no apparent conflict between VE's testimony and DOT); *Elizabeth V. v. Comm'r, Soc. Sec. Admin.,* No. CV ADC-19-2992, 2020 WL 7624776, at *5 (D. Md. Dec. 22, 2020) ("Plaintiff is correct that the ALJ failed to question the VE about whether there were any conflicts between her testimony and the information in the DOT [...However,] because no actual conflict exists between the VE's testimony and the DOT, the ALJ's failure to question the VE in accordance with SSR 004-p is harmless error and is not a basis for remand."); *Fender v. Berryhill*, No. 1:17-CV-00041-RJC, 2018 WL 1536485, at *3 (W.D.N.C. Mar.

29, 2018).

Accordingly, because Claimant does not identify any conflicts between the VE's testimony and the DOT, and she does not assert any other errors concerning the ALJ's determination that she could work as a housekeeper/cleaner, the undersigned **FINDS** that the ALJ properly relied on the VE's testimony at step five of the sequential evaluation.

**VIII.   <u>Recommendations for Disposition</u>**

Based on the foregoing, the undersigned United States Magistrate Judge respectfully **PROPOSES** that the presiding District Judge confirm and accept the findings herein and **RECOMMENDS** that the District Judge **DENY** Plaintiff's request for judgment on the pleadings, (ECF No. 10); **GRANT** the Commissioner's request for judgment on the pleadings, (ECF No. 15); **AFFIRM** the decision of the Commissioner; **DISMISS** this action, with prejudice, and remove it from the docket of the Court.

The parties are notified that this "Proposed Findings and Recommendations" is hereby **FILED**, and a copy will be submitted to the Honorable David A. Faber, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and three days (if received by mail) from the date of filing this "Proposed Findings and Recommendations" within which to file with the Clerk of this Court, specific written objections, identifying the portions of the "Proposed Findings and Recommendations" to which objection is made, and the basis of such objection. Extension of this time period may be granted by the presiding District Judge for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of

Appeals. *Thomas v. Arn*, 474 U.S. 140 (1985); *Snyder v. Ridenour*, 889 F.2d 1363 (4th Cir. 1989); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984). Copies of such objections shall be provided to the opposing party, Judge Faber, and Magistrate Judge Eifert.

The Clerk is directed to file this "Proposed Findings and Recommendations" and to provide a copy of the same to counsel of record.

**FILED**: November 17, 2021

Cheryl A. Eifert
United States Magistrate Judge

26